SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

DIVERSIFIED INDUSTRIES, INC., et al., Defendants.

Civ. A. No. 76–2114.

United States District Court, District of Columbia.

Feb. 5, 1979.

**106**

Michael F. Perlis, Adele R. Geffen, Washington, D. C., for plaintiff.

Daniel P. Levitt, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, William L. Borden, Washington, D. C., for defendant Aronoff.

Seymour Glanzer, Dickstein, Shapiro & Morin, Washington, D. C., for defendant Fox.

Donald J. Mulvihill, Cahill, Gordon & Reindel, New York City, for defendant Castle.

George P. Felleman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Robert Loeffler, Isham, Lincoln & Beale, Washington, D. C., for defendant JDL Trust.

Harvey L. Pitt, Fried, Frank, Shriver & Kampelman, Washington, D. C., for defendant Penn-Dixie Industries, Inc.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

In the Spring of 1975, the Securities and Exchange Commission (hereinafter, "the Commission") began investigating charges arising out of a proxy contest between Penn-Dixie Industries, Inc. (hereinafter, "Penn-Dixie") and Diversified Industries, Inc. (hereinafter, "Diversified"). The Commission's investigation resulted in the filing of this action on November 15, 1976, against Diversified, Penn-Dixie, Jerome Castle, Ben Fixman, Arnold Y. Aronoff, Sam Fox, Morris Lefton, Jack Kootman, E. Allen Payne, and Castle Bank and Trust, Ltd., as trustee for the JDL Trust.[1]

The complaint in this action consists of seven counts. The first three counts pertain to the internal affairs and business practices of Diversified and include charges of short-weighting customers, commercial bribery, and fraudulent bookkeeping. All of the defendants charged in these counts have consented to the entry of final judgment.

Counts IV through VI relate to a fraudulent real estate transaction. Count IV charges the defendants Castle, Aronoff, Penn-Dixie and the JDL Trust with violations of section 10(b) of the Securities Exchange Act of 1934 (hereinafter, "the Act"), 15 U.S.C. § 78j(b) (1976) and Rule 10b–5, 17 C.F.R. 240.10b–5 (1978). The Commission alleges that Aronoff conspired with Castle, then President and Chairman of the Board of Penn-Dixie, to arrange for the purchase of undrainable Florida swampland by Penn-Dixie for over five million dollars from the JDL Trust, a trust set up by Aronoff for the benefit of his parents and children. According to the complaint, the defendants

---

1. The complaint originally named the JDL Trust as a defendant. The JDL Trust then moved for dismissal for failure to name and serve the proper party in interest. Leave was granted on June 22, 1977 to amend the complaint to name the Castle Bank and Trust, Ltd., as trustee for the JDL Trust in place of the JDL Trust.

conspired to defraud the shareholders of Penn-Dixie by fraudulently inducing a public corporation to issue a security, the mortgage for the land, in connection with the acquisition of this investment property.[2]

Counts V and VI of the complaint allege violations of the reporting provisions of the federal securities laws. Count V charges that Castle, Penn-Dixie, and Aronoff violated section 13(a) of the Act, 15 U.S.C. § 78m(a) (1976) and Rules 12b–20 and 13a–1, 17 C.F.R. 240.12b–20 and 240.13a–1 (1978) by filing false and misleading Annual Reports which failed to disclose the allegedly fraudulent activities surrounding the purchase by Penn-Dixie of the Florida real estate. Count VI charges Castle and Penn-Dixie with violations of section 14(a) of the Act, 15 U.S.C. § 78n(a) (1976) and Rule 14a–9, 17 C.F.R. 240.14a–9 (1978) for filing false and misleading proxy statements which also failed to disclose the alleged swampland fraud.

Count VII of the complaint charges the defendants Castle, Penn-Dixie, and Fixman with violating section 13(d) of the Act, 15 U.S.C. § 78m(d) (1976) and Rule 13d–1, 17 C.F.R. 240.13d–1 (1978) for failing to file 13D schedules while beneficially owning more than five percent of the outstanding stock of Diversified.

On December 21, 1976, Arnoff filed a motion to dismiss and other relief and an alternative motion for severance and transfer. On January 11, 1977, the JDL Trust filed a similar motion for dismissal and other relief and an alternative motion for severance. Oral argument on these motions was held on June 15, 1977 before Judge Waddy.[3] On October 6, 1977, Castle filed a motion to dismiss, for summary judgment, and to strike the complaint as sham. This case is currently before the Court on these motions.

## I. THE PURCHASE MONEY MORTGAGE PENN–DIXIE ISSUED TO THE JDL TRUST IS A "SECURITY" WITHIN THE MEANING OF THE FEDERAL SECURITIES LAW.

The defendants in their papers in support of their motion to dismiss and in their oral argument before Judge Waddy have tried to characterize this case as an attempt by the Commission to convert the securities laws into a general remedy for real estate fraud. The defendants contend that if the Court finds that the securities laws apply in this case every homeowner who sells his or her home would be subject to the anti-fraud provisions of the 1934 Securities Exchange Act. The Commission distinguishes this situation from the average homeowner's case by pointing to three factors: (1) the note was issued for the acquisition of an investment asset, (2) the note was issued by a public company, and (3) the note was not initially issued to a bank or other party in the business of making loans.

To render the Securities Exchange Acts of 1933 or 1934 applicable to a transaction, a "security" must be exchanged. The Commission relies on the ten-year purchase money mortgage note Penn-Dixie issued to the JDL Trust as part payment for the Florida real estate to satisfy this requirement.

Although there are slight differences in wording between the 1933 and 1934 Acts, the definitions of "security" in the two acts have been treated as functionally equivalent. *See Tcherepnin v. Knight,* 389 U.S. 332, 335–336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *National Bank of Commerce v. All American Assurance Co.,* 583 F.2d 1295 (5th Cir. 1978); *United California Bank v. THC Financial Corp.,* 557 F.2d 1351, 1356 (9th Cir. 1977); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1255 (9th Cir. 1976).

The definitional section of the Securities Exchange Act of 1934, 15 U.S.C.

---

**2.** A Grand Jury in the Southern District of New York has indicted the defendants Aronoff and Castle for the fraudulent land transaction alleged in this case, and these defendants are awaiting a criminal trial on these charges.

*United States v. Aronoff,* 463 F.Supp. 454, 78 Crim. 0713 (October 10, 1978).

**3.** After Judge Waddy died following a long illness, this case was reassigned to this Judge.

§ 78c(a)(10) (1976), provides that, "unless the context otherwise requires—. . . (10) The term 'security' means any note . . . but shall not include . . . any note . . . which has a maturity date at the time of issuance of not exceeding nine months . . . ." The definitional section of the 1933 Act has a similar definition of "security" with the exception of the nine-month limitation. 15 U.S.C. § 77b(1) (1976). Although the statutes on their faces are readily discernible, judicial interpretation has clouded their clarity. In the words of a recent commentator:

The courts have recently made it clear that despite the apparently contrary language of (the definitional statutes), (1) not all notes of more than 9 months' duration are "securities" and not all notes of less than such duration are not "securities," (2) the decisive factor in the determination of whether notes fall within the 1933 or 1934 Act is the type of note, and not its duration, and (3) this decisive factor is itself not readily determinable.

Kaplan, Promissory Notes as Securities Under § 2(1) of Securities Act of 1933 (15 U.S.C. § 77b(1)), and § 3(a)(10), of Securities Exchange Act of 1934, 39 A.L.R.Fed. 357, 365 (1978).

Unfortunately, the U.S. Circuit Courts of Appeals that have confronted this issue have devised somewhat different tests to determine whether a note constitutes a "security," and the judges of this circuit court have yet to address this problem. Accordingly, the Court must examine the varying approaches taken by the different circuits to the problem before the Court.

### A. The Commercial/Investment Dichotomy Test of the Third, Fifth, Seventh, and Tenth Circuits.

The "investment/commercial dichotomy test," which has been followed in the Third, Fifth, Seventh, and Tenth Circuits, is premised on the view that Congress' concern in enacting the securities laws was with practices associated with investment transactions and that the securities laws were not designed to regulate commercial transactions. *See C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.) *cert. denied* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). The decision of the U.S. Court of Appeals for the Seventh Circuit in *C.N.S. Enterprises, Inc.* contains a helpful description of the investment/commercial test:

The ultimate question is whether the plaintiffs are simply borrowers in a commercial transaction who are not protected by the 1934 Act or investors in a securities transaction who are protected.

In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day.

On the other hand, the polarized extremes are conceptually identifiable: buying shares of common stock of a publicly-held corporation, where the impetus for the transaction comes from the person with the money, is an investment; borrowing money from a bank to finance the purchase of an automobile, where the impetus for the transaction comes from the person who needs the money, is a loan. In between is a grey area which, in the absence of further congressional indication of intent or Supreme Court construction, has been and must be in the future subjected to case-by-case treatment.

*Id.* at 1359. (citations omitted).

Although a case-by-case approach has been adopted under the commercial/investment dichotomy approach, courts have focused on certain factors to guide the application of the test. Despite the defendants' contentions to the contrary, one of the factors the courts have focused on in applying the test is the nature of the assets acquired in exchange for the notes. The defendants are correct in pointing out that every time an investment asset is acquired, the notes have not been determined to be securities under this test. *See Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973) (franchise); *C.N.S. Enterprises, Inc. v. G. & G. Enter-*

*prises, Inc.,* 508 F.2d 1354 (7th Cir.) *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975) (dry cleaning business); *Bellah v. First National Bank,* 495 F.2d 1109 (5th Cir. 1974) (cattle business). Nevertheless, the asset acquired has been recognized to be an important, and often determinative, factor in the court's determination. In *McClure v. First National Bank,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), Judge Roney analyzed prior federal decisions and concluded:

> [W]here notes have been deemed securities within the meaning of the securities laws, either of two factors . . . usually indicated the investment overtones of the underlying transaction. . . [The] notes were [either] offered to some class of investors, [or] were . . . acquired . . . for speculation or investment. . . . Second, . . . the borrower [obtained] investment assets, directly or indirectly, in exchange for its notes.

*Id.* at 493–94. (Citation omitted). On the latter point, the Court cites:

> *Rekant v. Desser,* 425 F.2d 872 (5th Cir. 1970) (real estate corporation issued note and stock to obtain land for subdivision); *Alberto-Culver Co. v. Scherk,* 484 F.2d 611 (7th Cir. 1973), rev'd on other grounds, 419 U.S. 885 [95 S.Ct. 157, 42 L.Ed.2d 129] (1974) (corporate note issued in purchase of foreign business entities); *Movielab, Inc. v. Berkey Photo, Inc.,* 452 F.2d 662 (2d Cir. 1971) (corporation issued promissory notes in exchange for assets of film processing and optical business); *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154 (S.D.N.Y.1974) (new notes containing different terms substituted for original notes given for tax-sheltered cattle and cattle management contracts); *Davis v. Avco Corp.,* 371 F.Supp. 782 (N.D.Ohio 1974) (notes given for loan to be used to buy into a pyramid distribution scheme with which finance company was associated); *Olympic Capital Corp. v. Newman,* 276 F.Supp. 646 (C.D.Cal.1967) (that note evidencing debt to small business investment company was security not ques-

tioned by parties); *cf. MacAndrews & Forbes Co. v. American Barmag Corp.,* 339 F.Supp. 1401 (D.S.C.1972) (bills of exchange issued for industrial machinery a form of notes subject to the Act). *Id.* at 494; *see also* Lipton & Katz, " 'Notes' Are Not Always Securities," 30 Business Law. 763, 766 (1975).

The Court finds that the note issued by Penn-Dixie in part payment for the real estate would qualify as a security under the investment/commercial test. First the land was not acquired to provide housing for a family or to build a new corporate headquarters, but was acquired for purely investment purposes. Second, the note was issued by a publicly held corporation, Penn-Dixie, to a trust not normally in the business of making loans, the JDL Trust. *See Lino v. City Investing Co.,* 487 F.2d 689, 696 (3d Cir. 1973). Third, the duration of the note, ten years, signifies a long-term stake in the progress of the investment, since the collateral for the loan, the land itself, would fluctuate in value with the success of the venture. Therefore, the Court finds that in the "complete context of [this] transaction," *id.* at 696 n. 15, the note was a security under the investment/commercial dichotomy test of the Third, Fifth, Seventh, and Tenth Circuits.

B. *The Risk Capital Test of the Ninth Circuit.*

■ The U.S. Court of Appeals for the Ninth Circuit applies a risk capital test in determining whether a note is a security. *See Amfac Mortgage Corp. v. Arizona Mall, Inc.,* 583 F.2d 426 (9th Cir. 1978). Under this test, the ultimate inquiry is whether the lender has contributed risk capital subject to the entrepreneurial or managerial efforts of others. *United California Bank v. THC Financial Corp.,* 557 F.2d 1351, 1358 (9th Cir. 1977); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1257 (9th Cir. 1976). Six factors have been considered in *Amfac Mortgage, Great Western,* and *United California Bank* to determine if the lender has contributed risk capital. The factors focused on are: (1) time, (2) collateraliza-

tion, (3) form of the obligation, (4) circumstances of issue, (5) relationship between the amount borrowed and the size of the borrower's business, and (6) the contemplated use of the funds. In this case, the mortgage was for an extended period (ten years). The collateralization was intertwined with the success or failure of the venture. The obligation took the form of the seller providing the loan to facilitate the sale. The circumstances of issuance were such that one not normally in the business of making loans made the loan to a publicly held corporation. The amount borrowed was a significant portion of the value of the venture. Finally, the funds were used to obtain an investment asset. The Court finds that in combination these factors demonstrate that the lender, the JDL Trust, has contributed risk capital subject to the entrepreneurial and managerial efforts of Penn-Dixie. Therefore, the purchase money note is a security under the risk capital test of the Ninth Circuit.

C. *The Literal Approach of the Second Circuit.*

■ The broadest approach to determining whether a note constitutes a security under the federal securities laws has been taken by the U.S. Court of Appeals for the Second Circuit. In *Exchange National Bank v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976), Judge Friendly, writing for the court, held that a party asserting that a note with a maturity longer than nine months is not a security within the 1934 Act, has the burden of proving that the "context" requires that result. In the course of his opinion, Judge Friendly offered some guidance for future cases:

> One can readily think of many cases where [the context otherwise requires]— the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the

ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity date exceeding nine months, § 10(b) of the 1934 Act should generally apply.

*Id.* at 1138 (citation omitted).

Since the mortgage in this case is on land held for investment purposes, instead of a home, as in Judge Friendly's example, the note would plainly constitute a security under the Second Circuit's test.

The Court feels that the Second Circuit's approach is most consistent with the language of the statute and Congressional intent and is by far the easiest test to apply. The defendants in this case urge the Court to reject this test because of its inconsistency with the Supreme Court's decision in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

In *Forman* the Court reversed a decision by the Second Circuit for taking an excessively literal approach to the problem of defining securities. The approach taken by the Second Circuit in *Forman,* although termed literal, bears little resemblance to the approach taken by Judge Friendly in *Exchange National Bank.* In *Forman,* the tenants of Co-op City, a low-income cooperative in the Bronx, brought suit alleging violations of the federal securities laws. To acquire an apartment in Co-op City, a prospective tenant has to purchase shares of what is termed "stock." The Court rejected the extremely literal approach of the court of appeals in favor of one in which form would be disregarded in favor of substance, and the emphasis would be on economic realities. *Id.* at 848, 95 S.Ct. 2051. And, applying that test in *Forman,* the Court ruled that the tenants were buying a place to live, not investing their money; therefore, the "stock" was not a security.

In the course of its opinion, in language the defendants heavily rely upon in this case, the Court observed:

The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. . . . By contrast, when a purchaser is motivated by a desire to use or consume the item purchased—"to occupy the land or to develop it themselves," . . .—the securities laws do not apply.

*Id.* at 852–53, 95 S.Ct. at 2060–61 (citations omitted). The holder of the note in this case, the JDL Trust, has attributes that satisfy the holding of the Court in *Forman.* In this case, the "purchaser" of the security (the recipient of the note) is the JDL Trust, and plainly the holder of the note did not plan to occupy or develop the land, but relied on the skills of Penn-Dixie to reap the benefits of the investment. In cases in which the note is acquired for investment purposes, the *Forman* test is satisfied. Therefore, the decision of Judge Friendly in *Exchange National Bank* is consistent with the Court's decision in *Forman* and the result in this case.

Accordingly, the Court finds that the purchase money note issued by Penn-Dixie to the JDL Trust as part payment for the Florida real estate is a security within the meaning of the federal securities laws as construed by all of the available standards.

## II. VENUE IN THE DISTRICT OF COLUMBIA IS PROPER IN THIS ACTION.

█ The defendants contend that venue does not lie in the District of Columbia and the action should be dismissed or transferred. The Commission relies on section 27 of the Securities Exchange Act, and the co-conspirator venue theory. Section 27 provides that a "proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. . . . ." The co-conspirator venue theory, in essence, provides:

[A]ny allegation of a securities act violation is sufficient for venue purposes even as to a defendant who did not commit an act within the district if that defendant is in league with a defendant who did act within the district.

*Levin v. Great Western Sugar Co.,* 274 F.Supp. 974, 978 (D.N.J.1967). All that is required is one act within the district which represents more than an immaterial part of the allegedly illegal events. *Securities and Exchange Commission v. National Student Marketing Corp.,* 360 F.Supp. 284, 293 (D.D.C.1973).

In this case, Penn-Dixie filed with the Commission in Washington, D.C., an annual report on Form 10–k. This report was publicly disseminated to, among others, Penn-Dixie shareholders in this District. At this time, the defendant Castle was president and chairman of Penn-Dixie. The report did not refer to the purchase by Penn-Dixie of the Florida land from the JDL Trust. The Court finds that the allegedly false filing was a material part of the scheme and that an act of an alleged co-conspirator occurred in this District. Thus, all the alleged conspirators are subject to suit by the Commission in this jurisdiction.

## III. THE COMPLAINT STATES A CLAIM AGAINST EACH OF THE DEFENDANTS.

█ The JDL Trust and the defendant Castle contend that certain counts of the complaint fail to state a claim and allege fraud with insufficient particularity in violation of rule 9(b) of the Federal Rules of Civil Procedure. The Court finds that the facts of the fraud are sufficiently pleaded. The details of the scheme are set out in over 40 paragraphs. The complaint adequately apprises the defendants of the basic transaction upon which the claim of fraud is based and enables the defendants to prepare their defense.

The defendant Aronoff contends that Count V of the complaint, which charges him with aiding and abetting a violation of section 13(a) of the Act, fails to state a claim upon which relief can be granted. Aronoff contends that the complaint fails to charge knowledge and substantial participation in the violation. The Court finds that even if such allegations are necessary, both

of these elements of the offense are adequately alleged. Count V refers to numerous other paragraphs in the complaint in which the entire scheme is set out in great detail. A fair reading of Count V, along with its cross-references, makes out a case that Aronoff had a knowing and substantial part in the scheme, part of which necessarily included an unwillingness to disclose the nature of the scheme in the required reports. Accordingly, the complaint is sufficient to withstand a motion to dismiss for failure to state a claim.

■ The defendant Castle has also moved for summary judgment. The Court finds that there are numerous issues of material fact in dispute. Castle's affidavits set forth only ultimate facts and conclusions with little probative value in summary judgment proceedings. *See Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc.*, 479 F.2d 135, 139 (5th Cir. 1973).

■ The defendant Castle's contention that the complaint should be stricken as sham because of a lack of good faith on the Commission's part is groundless.

An order in accordance with this memorandum opinion will be issued of even date herewith.