**Lewis I. BAURER, Appellant**

v.

**The PLANNING GROUP, INC., et al.**

**No. 80–2583.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1981.

Decided Dec. 4, 1981.

Ernest M. Stern, Washington, D. C., with whom James Michael Cassidy, Washington, D. C., was on the brief for appellant.

Alan S. Anderson, Washington, D. C., for appellees.

Before ROBINSON, Chief Judge, WIL-KEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This appeal questions whether the term "security," as defined by the Securities Act of 1933 [1] and the Securities Exchange Act of 1934,[2] includes a short-term promissory note given in exchange for funds advanced in anticipation of securing a limited partnership interest. In light of the broad remedial purposes of the securities laws, which mandate sufficiently flexible construction to include "[n]ovel, uncommon, or irregular devices" which function as investments,[3] we hold that the note involved here is a security.

## I. BACKGROUND

Originally the defendants in this action included Lawrence Feldman and his controlled corporation (The Planning Group, Inc. (TPGI)); Jaclyn and Theodore Kramer; and 475 H Street, Inc. (of which Theodore Kramer was sole shareholder at all relevant times).[4] Feldman's corporation, TPGI, acted as managing agent for 475 H Street, Inc.[5]

In the spring of 1978, Feldman began discussing with the appellant Lewis Baurer, the Kramers, and another couple, Ida and Robert Mantel, the formation of a limited partnership, to be known as "Citybank Associates," which would purchase and manage property located on 8th Street, S. E., in Washington, D. C. Subsequently, Feldman prepared and distributed to the potential partners two drafts of a partnership agreement.[6] Following a pattern established in their previous transactions, Baurer tendered to Feldman a check made out to TPGI and received in exchange the following note, typed on TPGI stationery:

June 21, 1978

### PROMISSORY NOTE

The undersigned promises to pay to the order of Lewis Baurer the sum of Fifteen Thousand Dollars ($15,000) on demand.

The loan signified by this instrument being in lieu of a capital contribution to City Bank Properties Associates, a District of Columbia limited partnership currently being organized. In the event that the parties are unable to reach agreement within thirty (30) days from date hereof on the terms of the partnership agreement, this note shall be due and payable in full. Maker reserves the privilege of making payment on principal at any

---

1. The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
15 U.S.C. § 77b(1).

2. The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.
15 U.S.C. § 78c(a)(10).

3. *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943).

4. Claims against four other defendants named in the complaint were dismissed by stipulation.

5. *See* Depositions of Jaclyn Z. Kramer and Theodore E. Kramer, Appendix to Brief for Appellant ("Appellant's Appendix") at A–45, 51–52.

6. Draft of Citybank Associates Agreement of Limited Partnership 1978, Appendix to Brief for Appellees ("Appellee's Appendix") at B–1; Executed Citybank Associates Agreement of Limited Partnership 1978, Appellee's Appendix at B–35.

amount at any time. It is understood that upon the execution of the Limited Partnership Agreement, the principal sum shall be deemed paid in full and the accrued interest will be due and payable.

Interest shall accrue at the rate of the flat sum of NONE to June 30, 1978 and 12% per annum from July 15, 1978.

THE PLANNING GROUP, INC.

By: /s/

LAWRENCE C. FELDMAN

President

For value received I hereby guarantee the payment of the principal and income of the foregoing note as they respectively come due and payable.

By: /s/

LAWRENCE C. FELDMAN [7]

In a previous transaction, Baurer had also advanced funds in exchange for a similar promissory note,[8] and later, when the partnership agreement had been approved, signed a Subscription Agreement and Agreement and Certificate of Limited Partnership in Blue Line Avenue Properties Associates.[9] This time, however, although Feldman succeeded in organizing a partnership—with 475 H Street, Inc. as general partner and the Mantels as limited partners,[10] the partnership plan was not acceptable to Baurer. Baurer therefore demand-ed return of his funds in August, 1978.[11] Feldman was unable to comply, apparently because he had used Baurer's funds to pay TPGI's outstanding debts. Feldman, instead, executed an assignment to Baurer of a portion of the proceeds of any future sale of the 8th Street property which Citybank had been organized to manage.[12] Baurer claims that he was subsequently assured by the Kramers, as well as by Feldman, that his funds would be returned when the property was sold. The Kramers, in turn, say that they were under the impression that TPGI had purchased an interest in Citybank and it was TPGI's interest in any sale proceeds of the property that Feldman had assigned to Baurer. According to the Kramers, they first learned that TPGI had failed to make a partnership contribution at the time of the actual sale of the property in November of 1978. Because TPGI owned no interest in the Citybank property, no distribution of the sale proceeds was made to TPGI or Baurer as its assignee. Instead the proceeds were divided between 475 H Street, Inc. and the Mantels.[13]

On April 13, 1979, after his demands for payment were denied, Baurer filed this action in the district court, alleging violations of the Securities Acts [14] and various com-

---

7.  Appellee's Appendix at B–35.

8.  Promissory Note for Blue Line, Appellant's Appendix at A–126.

9.  Deposition of Lewis Baurer, Appellant's Appendix at A–6, 9.

10.  Executed Citybank Associates Agreement of Limited Partnership 1978, Appellee's Appendix at B–36.

11.  Letter August 25, 1978 Baurer/Feldman, Appellee's Appendix at B–68.

12.  Exhibit Q, filed with the District Court January 8, 1980.

13.  Statement of the Distribution of the Assets of Citybank Associates Upon Dissolution of the Partnership, filed with the District Court October 3, 1979.

14.  Baurer relied on provisions in the 1933 Act expressly creating a private cause of action against a seller of a security who engages in prohibited practices "in connection with pro-spectuses and communications," Securities Act of 1933 §§ 12(1), (2), codified at 15 U.S.C. §§ 77l(1), (2), and on implied causes of action under antifraud provisions of both the 1933 Act, Securities Act of 1933 § 17, codified at 15 U.S.C. § 77q, and the 1934 Act, Securities Exchange Act of 1934 § 10, codified at 15 U.S.C. § 78j; Rule 10b–5, 17 C.F.R. § 240.10b–5.

The conduct and parties that may be reached vary under these different sections. Section 12(1) of the 1933 Act, 15 U.S.C. § 77l(1), imposes "virtually absolute" liability for sale of unregistered securities on the seller or a person in control of such a seller. III L. Loss, Securities Regulation 1693 (2d ed. 1961). Section 12(2) of the 1933 Act and section 10 of the 1934 Act are directed against fraud in securities transactions. Rule 10b–5, promulgated under the 1934 Act, provides the broadest coverage of all. *See* A. Bromberg & L. Lowenfels, Securities Law § 2.1 (1981). For example, Rule 10b–5 reaches "any person" engaged in fraud to induce the purchase of securities whereas section 12(2) reaches the actual "offeror or seller" only. *Id.*

mon law claims. The Kramers and 475 H Street, Inc., filed a motion to dismiss and subsequently a motion for summary judgment, which Feldman and TPGI later joined. The defendants argued for dismissal on the grounds that Baurer lacked standing to sue under the Securities Acts because he had never purchased a security. In reply, Baurer asserted that (1) he had entered into a contract to purchase a limited partnership interest which is a security, and (2) the promissory note was itself a security. In September, 1980, Judge Pratt granted the summary judgment motion of the Kramers and 475 H Street, Inc. and denied the summary judgment motion of Feldman and TPGI.[15] He later denied Baurer's motion for reconsideration. In November, 1980, Judge Pratt approved an offer of confession of judgment of $15,000 plus in-

terest by Feldman and TPGI (the Kramers' brief notes, however, that it is probable that Feldman and TPGI are judgment proof). Baurer pursued his claims against the Kramers and 475 H Street, Inc. by timely filing a notice of appeal from the grant of summary judgment in their favor.

■ Judge Pratt's order dismissing the claims against the Kramers and 475 H Street, Inc. stated only that Baurer had never acquired a partnership interest in Citybank, a question as to which he found "no genuine issue of material fact." Since, however, the order granted summary judgment to the appellees, it must also be interpreted as denying Baurer standing to sue under the Securities Acts for failure to have purchased a "security" and as dismissing Baurer's pendent common law claims on the merits.[16] Baurer's main argument on

15. Judge Pratt also ruled in a separate order responding to defendant's motion to dismiss that there is no implied cause of action under section 17 of the 1933 Act. Baurer has not argued this issue on appeal, and we therefore do not decide this question.

16. Judge Pratt's order was vaguely phrased, and the parties at first disagreed as to whether the order dismissed the pendent common law complaints at all, or if it did so, whether the dismissal was with or without prejudice.

Upon consideration of the Motion for Summary Judgment of defendants Kramer and 475 H Street, Inc., the memorandum in support thereof and plaintiff's memorandum in opposition thereto and it appearing to the court that there is no genuine issue of material fact and that plaintiff was never a limited partner and never acquired a limited partnership interest in Citybank and that defendants Kramer and 475 H Street, Inc. are entitled to judgment as a matter of law, it is this 25th day of September, 1980

ORDERED that the Motion for Summary Judgment of defendants Kramer and 475 H Street, Inc. be and the same hereby is granted and judgment is entered in favor of said defendants; and it is

FURTHER ORDERED that this action be and hereby is dismissed as to defendants Kramer and 475 H Street, Inc. with prejudice.

We conclude that this order did dismiss the common law claims with prejudice but that it did so improperly. We base that judgment on three grounds. First, Judge Pratt's order makes no reference at all to any undisputed material facts or affidavits on which he must base findings of fact determinative of the common law claims. Neither does it cite any legal

basis for dismissing such claims. Second, the record reveals that issues of material fact did exist so that summary judgment on these claims would have been inappropriate, see Fed. R.Civ.P. 56. For example, Baurer asserts in his reply to the summary judgment motion that Feldman was acting as agent for the Kramers and 475 H Street, Inc. when he assigned the proceeds of any sale of the 8th Street property to Baurer. Plaintiff's Reply and Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment, at 10. This contention is not addressed at all by "Defendants' Statement of Material Facts Not in Dispute." Finally, the defendants' arguments in favor of summary judgment to which the order responded, dealt only in a cursory manner with the merits of the common law claims, and were primarily focused on obtaining dismissal of the federal claims. The defendants summarized their arguments as follows:

The complaint seeks to invoke the jurisdiction of the Court for the adjudication of claims arising under the Securities Act of 1933 and the Securities and Exchange Act of 1934. Plaintiff also seeks to persuade the Court to accept pendent jurisdiction over certain claims purportedly arising by virtue of common law.

The complaint alleges that Plaintiff purchased within the District of Columbia certain securities. The Court needs to ascertain from the record the exact nature and extent of Plaintiff's "interest," if any, in the securities.

Therefore, before proceeding with the instant litigation, the Court must determine first whether Plaintiff has the requisite stand-

appeal is that, despite having never consummated the Citybank partnership agreement, he is nonetheless a purchaser of a "security" and therefore entitled to sue under the Securities Act.

## II. THE PROMISSORY NOTE

Baurer relies on the definitional sections of the Securities Acts to support his claim that the promissory note he received from Feldman is a security. Both the Securities Act of 1933, which establishes disclosure requirements in the offer and sale of securities in interstate and foreign commerce,[17] and the Securities Act of 1934, which regulates securities exchanges and over-the-counter markets operating in interstate and foreign commerce,[18] include "any note" within their definitions of a "security." But there are some differences in language between the two definitional sections. While the 1933 Act defines "security" to include any "evidence of indebtedness," 15 U.S.C. § 77b(1), the 1934 Act's definition omits this phrase, *see* 15 U.S.C. § 78c(a)(10). The 1933 Act exempts certain short-term notes from the Act's registration requirements, 15 U.S.C. § 77c(a)(3), although all notes, without exception, are subject to the

Act's antifraud provisions. In contrast, the 1934 Act's definition of security, which controls the scope of its antifraud provisions, specifically excepts those notes with a maturity of nine months or less. 15 U.S.C. § 78c(a)(10).

A superficial reading of the two Acts would thus seem to bring this note clearly within at least the antifraud provisions of the 1933 Act but possibly, because of its short duration, beyond the scope of the 1934 Act. Since the bases of liability under the two Acts differ in scope and kind,[19] and Baurer's complaint relied upon both Acts for jurisdictional purposes, we must decide whether this note is a security under both Acts. Other courts that have addressed the status of notes under either Act have concluded that Congress did not intend coverage of the Acts to depend solely upon the maturity of a note. Rather, despite different rationales, those courts have concluded that whether or not a note is a "security" under either Act depends on whether the instrument is an investment, as opposed to a commercial note. *E.g., Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1257 (9th Cir. 1976); *Zabriskie v. Lewis*, 507 F.2d 546, 550 (10th Cir. 1974); *SEC v. Continen-*

---

ing to sue. Defendants submit that Plaintiff lacks standing under the securities laws and that this action must be dismissed.

Defendants' Statement of Points and Authorities, at 2 (filed Jan. 8, 1980).

Once the federal claims were dismissed by summary judgment, the district should have exercised its discretion not to hear pendent claims when "substantial time and energy have [not] been expended looking toward the resolution of a dispute that plaintiffs were entitled to bring in a federal court." *Rosado v. Wyman*, 397 U.S. 397, 404, 90 S.Ct. 1207, 1213, 25 L.Ed.2d 442 (1970). *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 716, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

In any case, upon remand, the district court should reinstate the common law claims, at least until the Securities Act claims have been disposed of, or, if summary judgment is now

appropriate as to those common law claims, indicate the factual basis and legal grounds on which such a judgment is based.

17. The term "interstate commerce" means trade or commerce in securities or any transportation or communication relating thereto among the several States or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia.

15 U.S.C. § 77b(7).

18. The term "interstate commerce" means trade, commerce, transportation, or communication among the several States, or between any foreign country and any State, or between any State and any place or ship outside thereof. The term also includes intrastate use of (A) any facility of a national securities exchange or of a telephone or other interstate means of communication, or (B) any other interstate instrumentality.

15 U.S.C. § 78c(a)(17).

19. *See* note 14 *supra.*

*tal Commodities Corp.*, 497 F.2d 516, 523–27 (5th Cir. 1974); *Lino v. City Investing Co.*, 487 F.2d 689, 694–95 (3d Cir. 1973); *Sanders v. John Nuveen & Co.*, 463 F.2d 1075, 1079–80 (7th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972); *SEC v. Diversified Industries, Inc.*, 465 F.Supp. 104, 107 (D.D.C.1979); *Oliver v. Bostetter*, 426 F.Supp. 1082, 1085 (D.Md.1977); *Anderson v. Francis I. duPont & Co.*, 291 F.Supp. 705, 708 (D.Minn.1968). *Cf.* 1 ALI, Federal Securities Code § 202(150)(B)(iii) comment (6)(a) ("This codifies the mercantile-investment dichotomy that is emerging as the least imperfect solution to a troublesome problem.") Even the Second Circuit, which has adhered to the "literal approach" (presuming that "any note" with a maturity date exceeding nine months is a security), inquires into the context of the transaction to determine whether that presumption has been rebutted. And, conversely, that same Circuit has expressed the view that "the mere fact that a note has a maturity of less than nine months does not take the case out of [the 1934 Act], unless the note fits the general notion of 'commercial paper.'" *Zeller v. Bogue Electric Mf'g Corp.*, 476 F.2d 795, 800 (2d Cir. 1973), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). (Friendly, J.) (dicta). *But see Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 n.19 (2d Cir. 1976) (Friendly, J.) ("We leave for another day the status under the 1934 Act of a note with a maturity of nine months or less. . . .").

■ We, too, find persuasive the reasoning that Congress intended to include investment notes of whatever duration within coverage of both Securities Acts and to exclude only commercial notes. Although the Supreme Court has not yet decided the question, we think our conclusion consistent with the Court's previously expressed approach toward construing a "security."

The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors . . . Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction:

'[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 [12 S.Ct. 511, 512, 36 L.Ed. 226] (1892).

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975).

In short, the Court appears to be rejecting a "literal" approach toward defining a security in favor of one that looks to the statutory goal of protecting investors.

■ To exclude short-term notes that represent genuine investments from the coverage of the 1934 Act would serve no discernible statutory purpose. As both Acts are aimed at the protection of investors, "[c]ourts have shrunk from a literal reading that . . . would produce a seemingly irrational difference in the scope of their antifraud provisions." *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1133 (2d Cir. 1976). Similarly, the Supreme Court has held that the definition of security under both Acts is "virtually identical," and the omission of "evidence of indebtedness" from the 1934 Act is without controlling significance. *Tcherepnin v. Knight*, 389 U.S. 332, 342, 344, 88 S.Ct. 548, 556, 557, 19 L.Ed.2d 564. The Court relied in part on the Senate Report accompanying the 1934 Act which stated that "the definition of security was intended to be 'substantially the same'" under both Acts. 389 U.S. at 342 (*quoting* S.Rep.No.792, 73d Cong., 2d Sess. 14 (1934)). Further support for the view that it would be inappropriate to exclude all short-term notes, regardless of their nature or purpose, from the definition of a security in the 1934 Act, comes from

the fact that the exclusionary language in the 1934 Act's definition closely tracks language of the 1933 Act exempting from the *registration* requirements "[a]ny note . . . which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 77c(a)(3). The only difference in the two sections is the 1934 Act's omission of the phrase "which arises out of a current transaction or the proceeds of which have been or are to be used for current transaction." Given the absence of any explanation in the legislative history for that omission,[20] other courts have reasonably construed the 1934 Act's exclusion of short term notes as coextensive with the narrow class of commercial instruments that Con-

gress exempted from the 1933 Act registration requirements: "short term paper of the type available for discount at a Federal Reserve bank and of a type which rarely is bought by private investors." H.R.Rep. No.85, 73rd Cong., 1st Sess., 15 (1933).[21] *See, e.g., Zabriskie v. Lewis*, 507 F.2d 546, 550 (10th Cir. 1974); *Zeller v. Bogue Electric Mfg. Corp.*, 476 F.2d 795, 799–800 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973).[22] We agree.

■ We thus direct our inquiry to whether the promissory note Baurer received from Feldman, although of less than nine months duration, represents essentially an "investment" rather than a commercial transaction. Although Courts of Appeals "have devised somewhat different tests to determine whether a note constitutes a 'security,'" *SEC v. Diversified Industries, Inc.*, 465 F.Supp. 104, 108 (D.D.C.1979), we have

---

**20.** Reference to the legislative history of the 1934 Act sheds no light on the importance or meaning of the difference between the two sections. The original draft of the 1934 Act, introduced in the Senate on February 9, 1934 and in the House on February 10, 1934, provided no exclusion for short-term notes. H.R. 8720, introduced in the House on March 19, 1934, contained a definition of a "security" that by its terms excluded only those short-term obligations arising "out of a current transaction or the proceeds of which have been or are to be used for current transactions," language identical to that used in section 3(a)(3) of the 1933 Act. After the "current transactions" phrasing was omitted and then restored in subsequent bills in the House and Senate, the reference to "current transactions" was deleted from the exclusionary language of the definition of a "security" in the final version of the 1934 Act. Since there is no legislative comment with respect to this deletion, it cannot be gainfully surmised whether the omission of the "current transactions" phrasing was an inadvertent mistake, an assumption on the part of the legislature that the clause was unnecessary, or a conscious attempt to distinguish section 3(a)(10) of the 1934 Act from section 3(a)(3) of the 1933 Act.

Comment, 39 U.Chi.L.Rev. 362, 398 (1972) (footnotes omitted).

**21.** Securities and Exchange Commission Release No. 33–4412 describes the SEC view:

The legislative history of the [1933] Act makes clear that section 3(a)(3) applies only to prime quality negotiable *commercial paper*

*of a type not ordinarily purchased by the general public*, that is, paper used to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks.

26 Fed.Reg. 9159 (1961) (emphasis added).

**22.** Judge Sprecher has suggested an additional basis for the view that investment notes of less than nine months' maturity are within the scope of the 1934 Act.

Our conclusion is further supported by Congress' characterization of short-term commercial paper in exempting it from certain provisions (but not antifraud provisions) of two of the other securities acts. Certain provisions of the Public Utility Holding Company Act of 1935 do not apply to a note or draft with a maturity not exceeding nine months, provided that it "is not part of a public offering" and aggregates not more than 5 percent of the other securities of the company. The Investment Company Act of 1940 defines "short-term paper" as paper with a maturity not exceeding nine months "and such other classes of *securities, of a commercial rather than investment character*, as the Commission may designate by rules and regulations."

In other words, when Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities.

*Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075, 1080 (7th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972) (footnotes omitted).

previously relied on the Supreme Courts' formulation of "security" to draw the distinction between "a genuine investment and other transactions." *Association of American R. R. v. U. S.*, 603 F.2d 953, 971 (D.C.Cir.1979) (defining "security" under Interstate Commerce Act with reference to Supreme Court decisions under the Securities Act); *United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1357 (9th Cir. 1977); *Bellah v. First Nat'l Bank of Hereford*, 495 F.2d 1109, 1115 (5th Cir. 1974). The test which "embodies the essential attributes that run through all of the Court's decisions defining a security," *United Housing Foundation v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), is drawn from *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). It turns on "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104.[23] The *Howey* Court endorsed the long-standing definition of "investment" as "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." 328 U.S. at 298, 66 S.Ct. at 1102. The *Forman* court further explicated the meaning of a security: "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." 421 U.S. at 852, 95 S.Ct. at 2060. *See International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 561, 99 S.Ct. 790, 797, 58 L.Ed.2d 808 (1979).

Although in our journey through the cases and treatises, we have not encountered a transaction precisely like this one, but cf. *SEC v. Addison*, 194 F.Supp. 709 (N.D.Tex.1961) (in gratitude for loan of money to mining operation, borrower would at his discretion allow lenders to participate in "millions of profits"; held that notes exchanged were "securities"), we conclude that this note bears the hallmarks of a security for the following reasons.[24] First, the terms of the agreement, described in the promissory note itself, establish its investment character. It is apparent on the face of the note that Baurer was induced to advance money by the promise of an investment opportunity with Feldman and others. Furthermore, Baurer advanced his funds in reliance on Feldman's representation of "entrepreneurial" and "managerial" skills in putting together a profitmaking organization, see Citybank Associates Offering Memorandum, Exhibit D, filed with the district court January 8, 1980, at 9–15; the advance was an effort to facilitate the formation of the partnership. The arrangement was not dissimilar from a pooling agreement, "where the buyer furnishes the funds and the seller the skill for speculating in the stock or commodity markets under an arrangement to split any profits." 1 L. Loss, Securities Regulation 489 (2d ed. 1961). The investor in a pooling arrangement has a security even before contributed funds are actually used to purchase stocks. *See Anderson v. Francis I. duPont & Co.*, 291 F.Supp. 705 (D.Minn.1968).

One possible objection to the analogy is that Bauer did not expect profits to come *solely* from the efforts of others. The Supreme Court has so far declined to express its view on whether, to establish the existence of a security, profits need come *solely* from the efforts of others. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837,

**23.** In *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1136 (2d Cir. 1976), Judge Friendly observed that the *Howey* test is "of dubious value" in the note context. Yet in the peculiar circumstances of this case we find the *Howey* formulation as helpful as Judge Friendly's formula of a "strong family resemblance" to archetypical examples of commercial transactions. 544 F.2d at 1138. As noted above, the Second Circuit has yet to decide the status of short-term notes under the 1934 Act. *See* 544 F.2d at 1138 n.19.

**24.** Baurer also claims that he entered into a contract to purchase a limited partnership interest which claim, if proved, might provide an independent basis for finding that he had purchased a "security." It is, however, a question of fact to be resolved in the district court whether there was any such additional contractual agreement between the parties.

852 n.16, 95 S.Ct. 2051, 2060 n.16, 44 L.Ed.2d 621 (1975). However, other Courts of Appeals have expressed support for the standard enunciated in *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973): "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *See, e.g., Martin v. T. V. Tempo, Inc.,* 628 F.2d 887, 889 (5th Cir. 1980); *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1039–40 (10th Cir. 1980); *Miller v. Central Chinchilla Group, Inc.,* 494 F.2d 414, 416–17 (8th Cir. 1974). By this measure, the promissory note in this case represents an investment. While Baurer expected profits to flow in part from his own participation in the formation of the partnership, the "failure or success of the enterprise" depended largely on Feldman's drafting an acceptable partnership agreement, bringing together the investors in it, as he had done in the past, and taking over the task of purchasing and managing, through his controlled corporation TGPI, the investment property itself.

We believe our holding compelled by the concept of a security that Congress incorporated into the Securities Acts. That concept "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). To fail to recognize this note as a security would create a new and possibly replicable loophole in protecting investors through the Securities Acts.

■ Finally, defendants challenge Baurer's standing on the grounds that he is not a "purchaser" of a security because he never joined the limited partnership agreement. They rely on *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), which denies standing under the 1934 Act to one who is not a "purchaser" of securities. This argument must fail, however, as the note is itself a security and the exchange of funds for an investment note constitutes a purchase under the Securities Acts. As noted in *Zabriskie v. Lewis,* 507 F.2d 546, 552 (10th Cir. 1974), "In 15 U.S.C. § 78c(a)(14) *sale* and *sell* are said to 'each include any contract to sell or otherwise dispose of.' The promissory notes were clearly 'disposed of' here and value was given."

In view of the foregoing, the case is remanded to the district court. We decide only that Baurer has standing to sue under the Securities Acts and express no view as to whether he is entitled to recover from the Kramers and 475 H Street, Inc., under either or both of those Acts or common law. These determinations must await further proceedings and rulings in the district court defining the relationships among the various parties and the representations made in the course of those relationships.

*Remanded.*