NORTHLAND CAPITAL
CORPORATION,
Appellant,

v.

A. David SILVER and A. David Silver
& Co., et al.

No. 83–1449.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 3, 1984.

Decided May 25, 1984.

---

Harris S. Ammerman, Washington, D.C., for appellant.

Edward M. Waibel, pro se, for appellee.

Before WALD, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting opinion filed by Circuit Judge WALD.

STARR, Circuit Judge:

This case presents a recurring issue, albeit in a unique factual setting, under the federal securities laws. The question before us is whether the transaction at issue here constituted a "purchase" or "sale" of securities under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Northland Capital Corporation ("Northland") brought this action under the 1934 Securities Exchange Act, 15 U.S.C. §§ 78a–78kk (1982), ("the '34 Act") and under the common law of fraud against A. David Silver, A. David Silver & Co., and various inside and outside directors of Watkins Corporation ("Watkins") to recover $50,000 remitted by Northland to Watkins via a wire transfer. Northland claimed that it had standing to bring a private cause of action under Rule 10b–5, promulgated under section 10(b) of the '34 Act, 15 U.S.C. § 78j(b).

On motion for summary judgment, the District Court concluded that Northland was not a purchaser of securities, inasmuch as Northland and Watkins never came to a meeting of the minds with respect to the purchase of the securities in question. The court therefore concluded that, under the case of *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), requiring a plaintiff to be an actual purchaser to satisfy Rule 10b–5's requirement that the fraud be "in connection with the purchase or sale of any securities," Northland had no standing to bring a private cause of action under the '34 Act. The court dismissed the remaining common-law claim, which was based solely upon the court's pendent jurisdiction. Northland appealed the District Court's judgment. For the reasons stated below, we affirm.

I

Successful closings of financial deals are fundamentally all alike; every unsuccessful closing is unsuccessful in its own way. The events that led to the unsuccessful closing here and precipitated this lawsuit began in the fall of 1978 when Watkins Corporation undertook a search for additional capital. Watkins, a District of Columbia corporation with its principal corporate offices in Northern Virginia, was engaged in the business of operating franchise outlets for the International House of Pancakes on the eastern seaboard. At its height, Watkins operated thirty such restaurants. The founder, chief executive officer, and major stockholder was Philander Claxton, III. Of relevance to the matter

before us, Mr. Claxton's principal duties included responsibility for the financial matters of the enterprise. Defendant Edward Waibel, the president of Watkins, was principally responsible for operations. There was no chief financial officer.

In 1978, Mr. Claxton on behalf of Watkins engaged A. David Silver of A. David Silver & Co., a New York venture capital concern, to raise one million dollars of additional capital for Watkins. This target was to be reached through a private placement with a consortium of small business investment companies (SBIC's). Mr. Silver prepared a memorandum describing the proposed investment and detailing Watkins' operations and financial condition. His description of Watkins was based on a 1977 audit report and a 1978 opinion letter purportedly prepared by Price, Waterhouse & Co., both of which are now acknowledged to be forgeries. Mr. Silver sent the memorandum to a variety of SBIC's, including Allied Capital Corporation ("Allied"), based in Washington, D.C., and plaintiff Northland Capital Corporation, based in Duluth, Minnesota. Plaintiff's Opposition to Defendant's Statement of Material Facts ¶ 26 ("Plaintiff's Statement").

Allied acted as the syndicator of the Watkins financing, persuading six other SBIC's to participate in the transaction. Allied was also a major participant, reserving $250,000 of the investment for itself. Plaintiff's Statement ¶ 29. Northland, on the other hand, was located far from the center of the action which was about to transpire. Capitalized at $350,000, Northland had at the time of this transaction only two employees, Mr. Barnum, who was its President, and Mrs. Dunphy, who was Mr. Barnum's secretary and who enjoyed the title of Assistant Secretary. Because of its small capitalization, Northland limited its participation in the Watkins financing to $50,000. Transcript of Deposition of George Barnum at 56 ("Barnum Deposition").

Like other SBIC's, Northland's sole business is to invest in small business. It is a veteran in the field, having participated in 30 to 40 investments since its incorporation in 1967. Barnum Deposition at 8. Northland, however, generally relies upon other SBIC's to close its portion of the transaction because Northland is usually a minor participant in any given financing and because, in Mr. Barnum's words, Duluth is not "the venture capital center of the world." *Id.* at 10. This financing was no exception to the rule. Mr. Barnum authorized Allied, which he characterized as "the lead investor," to act on Northland's behalf at the contemplated closing. *Id.* at 16, 101. He further stated that Northland "rode on [Allied's] coattails as far as setting the terms of the investment." *Id.* at 16.

After consulting with the other participating SBIC's Allied set forth the terms of the proposed investment in a letter dated January 26, 1979. For purposes of this case, the most important requirements imposed by the SBIC's upon Watkins were as follows: (1) that all amounts received from the investors would be used to construct new franchise locations; (2) that the total amount of the financing would be placed in a separate "development account" from which it could not be withdrawn except for use in the construction of franchise locations; and (3) that after the construction of a building, the realty and improvements would, under a sale-leaseback arrangement, be sold to other investors and leased back to Watkins.[1] In return for their infu-

**1.** These terms provide as follows:

1.07 The money borrowed will be used to construct new franchisee locations which must be approved by Allied.

1.08 The money will be placed in a separate development account of a bank approved by Allied. No funds can be withdrawn from the account, except to buy land, pay for construction of the building, interest on loan, fees and to finish completion of the locations, as approved in 1.07 above.

1.09 Once the location is complete and the store is operational, it is understood that the land and building will be sold to investors and leased back to Watkins. The sale will pay back into the bank account (1.08) the full amount used from the bank account to establish the land and building. The sale will not

sion of funds, the SBIC's were to receive not only interest but also *stock warrants to be delivered at the time of the closing.* Letter of David Gladstone of Allied Capital, to Mr. Claxton, Watkins Corp. (Jan. 26, 1979), Gladstone Deposition Exhibit 5.

With the transaction so structured, the closing was scheduled for March 9, 1979, a fact known to Mr. Barnum. He elected not to attend, however, having deserted Duluth for the sunnier climes of a West Indies island with no telephone service. Barnum Deposition at 37. Mrs. Dunphy, his secretary, testified that she was instructed by Mr. Barnum to dispatch the $50,000 Northland investment in accordance with Allied's instructions. Deposition of Elizabeth Dunphy at 8 ("Dunphy Deposition").

The ensuing events are of pivotal importance as to the nature of the Northland-Watkins transaction. By March 8, Mrs. Dunphy had received no instructions from Allied. As she herself was leaving for vacation the following day, she telephoned Allied's offices in Washington. However, according to Mrs. Dunphy's deposition testimony, she was unable to speak with an officer of Allied, and an Allied secretary suggested that she call Mr. Silver. She did so, but, according to Mrs. Dunphy, Mr. Silver unhelpfully replied that he was busy, that he did not know the date of the closing, and that she should call Mr. Claxton. In response to her ensuing call, Mr. Claxton told Mrs. Dunphy to wire the funds to the Union First National Bank of Washington in care of one Mr. Cherouny, a senior vice president of Union First. She wired the money, "assumed" that it would be held in escrow until the closing, and departed on vacation. Dunphy Deposition at 9–12. Fatefully, however, the funds were transferred by the bank to Watkins' general corporate account. This telephone conversation constituted the whole of Northland's communications with Watkins prior to the scheduled closing.

The next day, March 9, 1979, Mr. Gladstone, an officer of Allied, and Mr. Claxton met in an attempt to close the transaction. The meeting was unsuccessful because, among other things, Mr. Gladstone was concerned that Watkins' Board of Directors had not approved the transaction and that an opinion letter purportedly prepared by Watkins' counsel bore tell-tale marks of a forgery. A week later, Mr. Gladstone sent a letter which identified twenty-two items necessary "in order to close this loan." Soon thereafter, on March 21, 1979, negotiations foundered. On April 6, 1979, Mr. Silver sent a letter to the representatives of the participating SBIC's, officially informing them that the deal had been called off. The letter stated: "[A]ll of you have been to closings that didn't close. That's what happened with Watkins Corp. . . ." Memorandum of A. David Silver, A. David Silver & Co., to David Gladstone, Gladstone Deposition Exhibit 10. The financing, in fact, was never closed.

At the unsuccessful March 9 meeting, Mr. Claxton nonetheless executed a number of documents. Among those documents was an agreement letter from Watkins to Allied, setting forth Watkins' version of the contemplated transaction. The Watkins' version states, contrary to Allied's proposal of January 26, 1979, that Watkins would use 50 percent of the net proceeds from the financing for working capital and 50 percent to acquire additional sites to operate as restaurants. Letter of Mr. Claxton, Watkins Corp., to Allied Investment Corp., Paragraph I(A)(8). Barnum Deposition, Exhibit 6. The agreement letter stated that the closing was to take place on March 9. It further contemplated that notes and warrants "in the total aggregate amount of not less than seven hundred fifty thousand dollars . . . will be sold by the Company to the Purchasers at closing. . . ." *Id.*, Paragraph I(A)(1). The Watkins letter stated several "conditions of closing," including the requirement that Watkins furnish the purchasers with a

---

be made, unless the full amount can be paid into the fund.

Letter of David Gladstone, Allied Capital Corporation, to Mr. Claxton, Watkins Corporation (Jan. 26, 1979).

copy of the Board of Directors' resolution and a legal opinion from Watkins' counsel satisfactory to the purchasers. *Id.*, Paragraph V. The agreement letter had spaces at the end reserved for the signatures of the various SBIC investors to signify their acceptance of the terms of the proposed agreement. Importantly, these spaces remained blank.

Finally, and still at the March 9 meeting, Mr. Claxton signed at least one stock warrant and one debenture note. This warrant was subject to the terms of the Watkins letter which, as we have just seen, was unsigned by the SBIC's. Stock Warrant No. 6 of Watkins Corp. (March 9, 1979). Deposition of Marianne Sharp, Exhibit 2–C. The agreement, the note, and the stock warrant were then sent to Northland.[2]

On March 16, 1979, a full week after the March 9 meeting, Watkins' Board of Directors met to consider Mr. Claxton's proposal for the 1.25 million dollar financing.[3] By earlier memorandum, dated March 7, 1979, Mr. Claxton had notified his Board of the terms of the investment. This memorandum, like Watkins' version of the agreement already discussed, stated that the terms of the financing would allow Watkins to use half the proceeds as working capital and half for real estate development.[4] In response to Mr. Claxton's motion, the Board on March 16 authorized Watkins to borrow $1,250,000 from Allied, Northland and five other SBIC's "upon the terms and conditions substantially in accord with those outlined in [Mr. Claxton's] summary of the loan transaction and as discussed at this meeting of the Board of Directors March 16, 1979." Deposition of Edward Waibel, Exhibit 1. Despite the Board's approval, no closing, as we have seen, ever took place.

A good deal of water had flowed over the dam by the time of Mr. Barnum's return from the West Indies in early April. Upon his return to Duluth, Mr. Barnum found the documents sent the previous month by Mr. Claxton. When Mr. Barnum also discovered, from Mr. Silver's April 6 letter, that the financing had not closed, he became "suspicious" and thereupon called Mr. Claxton. In their ensuing telephone conversation, Mr. Claxton agreed to send back to Northland the $50,000 remittance and further agreed to treat the $50,000 as a simple loan to be repaid immediately with interest. Barnum Deposition at 39–41. On April 18, 1979, Mr. Claxton sent a Watkins check in the amount of $50,767.12 to Northland, representing both principal and accumulated interest on the loan. Mr. Barnum attempted to cash the check, but it was returned for insufficient funds. On May 10, 1979, Watkins filed a voluntary petition in bankruptcy in the United States District Court for the Eastern District of Virginia.

Northland then brought the present fraud action under both the '34 Act and the common law in the United States District

**2.** The District Court believed Mr. Claxton may also have signed warrants for other SBIC's. Indeed, the Plaintiff's Statement indicates that Mr. Claxton sent out documents to all SBIC's who did not attend the meeting. Plaintiff's Statement ¶ 37. *See also* Deposition of A. David Silver at 117 (stating that he assumed notes and warrants were sent to all out-of-town investors). However, because it is not clear from the record that other non-attending SBIC's received warrants and because on appeal from a grant of summary judgment we must draw all inferences in favor of the appellant, we assume that Mr. Claxton sent a stock warrant and debenture note only to Northland.

**3.** The original amount suggested by Mr. Silver for the investment was one million dollars, but in the court of syndication it was raised to $1.25 million.

**4.** The memorandum to the Board stated as follows:

Following meetings and conversations with representatives of the SBIC's with whom we have been negotiating, a tentative agreement has been reached, subject to your approval and that of Union First [Bank]. The terms of the proposed loan are as follows: (1) The total amount will be $1,250,000, of which $625,000 will be for real estate development and $625,000 will be for working capital.... (4) The real estate portion of the loan will be subordinated to $2,500,000 of additional financing. The working capital portion will be subordinated to all Senior Debt....

Deposition of Robert Cherouny, Exhibit 9.

Court for the District of Columbia. In its federal claim, Northland alleged that it had been defrauded "in connection with a purchase or sale of a security" and therefore enjoyed standing to sue under section 10(b) and Rule 10b–5 promulgated thereunder. After extensive discovery, defendants moved for summary judgment on the grounds that on the undisputed facts Northland was not a "purchaser" of securities. The District Court granted the motion, concluding that there was "no meeting of minds" between Watkins and Northland and thus Northland never became a purchaser of securities. The court then dismissed the pendent common-law claim. Northland appealed the district court's judgment. Prior to oral argument in this appeal, Northland entered into a voluntary dismissal with all defendants except Edward Waibel, Watkins' former president.

## II

### A

Section 10(b) of the '34 Act and Rule 10b–5 promulgated thereunder prohibit manipulative and fraudulent devices "in connection with a purchase or sale of a security."[5] Interpreting this language in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court held that only actual purchasers or sellers of securities may bring a private damages action under Rule 10b–5. While suggesting that such a

limitation served the policy objective of avoiding vexatious litigation identified in the seminal case of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), the Court's holding was based ultimately on its interpretation of the language of the Act and its legislative history.[6]

Thus, we reject at the outset appellant's argument that *Blue Chip*'s holding should not govern cases such as the instant one since this type of case may not present a danger of strike suits. Indeed, in *Blue Chip* itself, the appellate court had accepted the *Birnbaum* interpretation of 10b–5 as a general principle, but carved out an exception in the circumstances of that case, because Manor Drug had been offered Blue Chip securities as part of an antitrust consent decree. The appellate court held that Manor's identification as an offeree in a written document served the same function as a contract in delimiting the appropriate plaintiffs under 10b–5. The Supreme Court, however, held to the contrary, concluding that entertaining such a theory "would leave the *Birnbaum* rule open to endless case-by-case erosion ... depending on whether a particular group of plaintiffs were thought ... to be sufficiently more discrete than the world of potential purchasers at large to justify an exception." 421 U.S. at 755, 95 S.Ct. at 1934.[7]

---

**5.** The dissent declares that we should construe the definition of "sale" in the '34 Act to conform to the different definition contained in the Securities Act of 1933. Dissent at 1433. The Supreme Court's decision in *Blue Chip*, however, takes precisely the opposite approach: it interprets the differing language of the two Acts as evidence of the Acts' *differing* ambits. *See Blue Chip Stamps*, 421 U.S. at 733–734, 95 S.Ct. at 1924–1925 (noting that Congress' use of the term "in offer or sale" in the 1933 Act showed that "when Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly"). To ignore the linguistic differences between the definitions in the two Acts is to suggest implicitly that Congress did not know what it was doing when it chose the differing language. This we refuse to do.

**6.** *See Blue Chip Stamps*, 421 U.S. at 733 n. 5, 95 S.Ct. at 1924 n. 5 (holding that "the wording of § 10(b), making fraud *in connection with purchase or sale of security* a violation of the Act, is surely badly strained when construed to provide a cause of action, not to purchasers or sellers of securities, but to the world at large") (emphasis in original).

**7.** The dissenting opinion seems to ignore the Supreme Court's refusal to engage in case-by-case policy analysis in *Blue Chip*. That refusal demonstrates that although the Supreme Court took policy analysis into account in reaching its conclusion that the '34 Act required a plaintiff to be a purchaser to have standing to sue, it established this requirement as a *per se* rule which could not generally be rebutted by policy considerations in individual cases. The dissent is also incorrect in stating that our requirement

In the post-*Blue Chip* securities world, a person must be a "purchaser" or "seller" within the meaning of the Securities Exchange Act to have standing to bring suit under Rule 10b–5.

## B

We thus turn to the question whether Northland is a "purchaser" of securities. A "purchase or sale" under the Act is defined as including "any contract" to purchase or sell a security. 15 U.S.C. § 78c(a)(13) & (14). The terms "purchase" and "sale" are to be broadly construed to effectuate the remedial purposes of the '34 Act, *see Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234, 1240 (D.C.Cir.1978); *Goodman v. Epstein*, 582 F.2d 388, 410 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), and are not limited to their common-law meaning. *See Broad v. Rockwell International Corp.*, 614 F.2d 418, 435 (5th Cir.1980). Therefore, courts have not allowed common-law technicalities, which may pose traps for the unwary and opportunities for the unscrupulous, to stand in the way of finding a statutorily cognizable "purchase" or "sale." [8]

■ The '34 Act's vital remedial purposes cannot, however, be permitted to strip the statutory words "purchase or sale" of their core meaning. It is, after all, a statute with express terms that is before us for examination. *See Symons v. Chrysler Corp. Loan Guarantee Board*, 670 F.2d 238, 241 (D.C.Cir.1981) (holding that the principle that remedial statutes are to be liberally construed to effectuate their purpose "does not give the judiciary license, in interpreting a provision, to disregard entirely the plain meaning of words used by Congress"). *See also Sacks v. Reynolds, Inc.*, 593 F.2d at 1240 (applying the plain meaning rule in the context of a 10b–5 action). A bedrock requirement for the formation of any contract or bargain between unrelated parties, including those constituting a purchase or sale, is that the putative purchaser and seller come to a meeting of the minds or, in the phrase of the Restatement (Second) of Contracts, mutual assent on the essential terms of the transaction.[9] This requirement is presupposed by the case law interpreting Rule 10b–5: for instance, in determining when a purchase is made, courts look to the time at which there was a "meeting of the minds." *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir.1972).

■ It is clear from the undisputed facts of this case that no mutual assent occurred

of mutual assent, discussed in the text that follows, is at odds with any policy concern of *Blue Chip*. Dissent at 1434–1435. *Blue Chip* was concerned that "vexatious" litigation would result from allowing plaintiffs standing to sue on the mere allegation that they intended to buy or sell a security. The Court feared that defendants would have difficulty disposing of such suits because of the subjective nature of the plaintiff's proof of intent. *Blue Chip*, 421 U.S. at 743, 95 S.Ct. at 1929. Vexatious litigation is obviously no more likely, however, when a plaintiff must show that there was mutual assent between the offeror and himself. Moreover, a plaintiff does not have to adduce proof of the defendant's subjective intent in order to prove mutual assent. The principle that objective manifestation of intent is controlling in contract formation is very well established. *See* WILLISTON ON CONTRACTS 42 (1957).

**8.** For instance, some courts have allowed an oral agreement, albeit unenforceable under the statute of frauds, to serve as a predicate for standing to sue under 10b–5. *See Desser v. Ashton*, 408 F.Supp. 1174 (S.D.N.Y.1975); *but*

*see Southeastern Waste Treatment, Inc. v. Chem-Nuclear Systems, Inc.*, 506 F.Supp. 944 (N.D.Ga. 1980).

**9.** *See* RESTATEMENT (SECOND) OF CONTRACTS § 3 (1977) (defining "agreement" as "a manifestation of mutual assent on the part of two or more persons" and defining bargain as "an agreement to exchange promises or to exchange a promise for a performance or to exchange performances"); RESTATEMENT (SECOND) OF CONTRACTS § 17 (stating that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and consideration"). Therefore, whether Northland attempts to predicate the existence of a purchase on a bargain, which consists of a fully executed exchange, *see* RESTATEMENT (SECOND) OF CONTRACTS § 3, comment c, or on a contract, which consists at least in part of a promise of future performance, mutual assent is required. *See also* WILLISTON SALES § 7–2 (1973); 1A CORBIN ON CONTRACTS § 29, at 82–83 (1963).

between Watkins and Northland. In financings such as the one proposed here, transactions are usually consummated by a formal closing or settlement at which the parties formally agree to terms and execute the requisite documents embodying the agreement. In the contemporary age of lawyers, accountants, and financial analysts, a financing is seldom, if ever, the result of a simple handshake between two principals. The structure of the financing here was therefore typical. No oral agreement on terms was reached, and it is abundantly clear that all parties contemplated that a closing was necessary for there to be a deal. Indeed, Mr. Barnum expressly authorized Allied to act on Northland's behalf at the contemplated closing, thus not only signifying the understanding that a closing was necessary but also that Northland intended to enter the transaction as part of a consortium of investors, not as a solitary investor operating independently of its fellow SBIC's. The documents that Mr. Claxton sent out on behalf of Watkins on March 9 also plainly contemplated both a closing and a transaction with a group of investors.

It is undisputed that the closing contemplated by the parties never took place. As we have seen, on the day the closing was to have occurred Allied, acting on behalf of the investors, found numerous differences with Watkins with respect to the terms of the transaction. In addition, Allied's representatives became suspicious about some of the supporting documentation provided by Watkins. These differences and suspicions were never resolved.

Northland does not dispute this, but nonetheless contends that even in the absence of a closing, Mrs. Dunphy's wiring of $50,000 when taken together with Mr. Claxton's sending of a stock warrant and note to Northland represent a separate transaction between Northland and Watkins, cognizable under the federal securities laws. These actions, however, even when taken together, do not suggest that Northland and Watkins gave mutual assent to a contract or bargain constituting a purchase of securities. To have mutual assent in these circumstances, one party must have accepted by word or deed an offer from the other.[10] Here, under the specific circumstances presented, neither the wiring of the $50,000 nor the sending of the stock warrant can reasonably be interpreted as an acceptance.

Northland, of course, was entirely at liberty to come to a separate agreement with Watkins, but the testimony of Mrs. Dunphy, Northland's secretary, clearly indicated that it did not do so. As we have seen, Mrs. Dunphy testified that she was instructed to find out from Allied where she should send Northland's funds so as to be available for the closing. After unsuccessful attempts to get instructions from Allied, the lead investor, she called Mr. Claxton of Watkins to find out where she should wire the money. Mrs. Dunphy testified that she intended the $50,000 to be held in "escrow" until a closing occurred on the proposed $1,250,000 financing. Thus, Mrs. Dunphy's ministerial act can by no stretch of the imagination be interpreted as acceptance, on behalf of Northland, of a separate offer from Mr. Claxton. Her action in no wise changed the understanding of all the parties that Allied and Watkins would have to close the deal before a purchase would take place.

Nor does Mr. Claxton's sending to Northland the Watkins' version of the letter agreement, together with a note and warrant which were subject to the terms of the letter, render the transaction a purchase notwithstanding the aborted closing. First, even if Mrs. Dunphy's sending the $50,000 could somehow be construed as an invitation to a separate, individual transaction that could have been consummated

---

**10.** RESTATEMENT (SECOND) OF CONTRACTS § 22 states: The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.

The exceptions to this rule, set out in comments a and b to the RESTATEMENT, are not relevant here.

without a formal closing, it is clear that the documents sent by Mr. Claxton to Northland were not intended to evidence or constitute an acceptance. Indeed, the agreement which Mr. Claxton sent to Northland had a space reserved for Northland's signature to allow Northland to evidence its acceptance of the terms of the agreement. *It is undisputed that neither Northland nor Allied acting on its behalf ever signed the agreement.* [11] Moreover, it is undisputed that the Watkins agreement letter contained a critical term plainly at variance with Allied's proposal on behalf of the SBIC's.[12] Thus, the agreement and warrant which Mr. Claxton returned to Northland contained materially different terms on an essential item of the contract from those Northland was offering, and thus could not constitute an acceptance. *See* Restatement (Second) of Contracts § 59.[13]

Our conclusion that neither Mrs. Dunphy's nor Mr. Claxton's actions sufficed to create a purchase of securities is confirmed by Mr. Barnum's own understanding. When Mr. Barnum returned to Duluth from the Caribbean he became suspicious when he found documents that would normally be sent as part of a closing, but discovered that in fact no closing had taken place. He promptly telephoned Mr. Claxton. They immediately agreed in that conversation that Northland's money would be returned, with interest, and that the transaction would be treated as a simple loan. Mr. Barnum never signed the proposed agreement that Mr. Claxton had sent. In short, Mr. Barnum, on behalf of Northland, never acted as a purchaser of a security but rather as one who was trying to recover money his company had plainly intended to place in escrow after discovering that the transaction had been called off.[14]

---

**11.** The dissent seems to imagine facts when it asserts that "Claxton knew of the terms Northland desired when it sent its $50,000, but Northland did not know that Watkins had proposed its own terms." Dissent at 4. Under the undisputed facts, Northland was not playing the role of lone wolf, departing from the pack led by Allied to cut its own deal and present its own terms. It is clear beyond cavil that all Mrs. Dunphy was seeking to do in effecting the wire transfer was to have Northland's share of funds, pursuant to its commitment to the consortium, available for the closing that was destined not to be. By no stretch of the imagination, much less the facts, was Mrs. Dunphy setting forth some new or separate terms on behalf of Northland.

**12.** As discussed in the text above, Allied required that all the investment funds be used by Watkins to obtain construction sites; in contrast, the document sent to Allied provided that Watkins could use one-half the investment money for working capital.

**13.** The Watkins Board's acceptance of Mr. Claxton's proposal does not aid the appellant in establishing mutual assent, because Mr. Claxton's proposals were, as we have seen, at variance with the proposals of the investors.

**14.** We hold that, under these circumstances, where no manifestation of mutual assent ever existed between the parties, no "purchase" within the meaning of the '34 Act occurred. This holding, however, does not prevent a court from finding a purchase where there was an apparent manifestation of mutual assent that was negated by a party's misrepresentation. An example of

this situation would be when a person agrees to sell valuable securities of Company A contained in a paper envelope to an investor who agrees to the transaction. In our hypothetical, the envelope actually contains the worthless securities of Company B. Under RESTATEMENT (SECOND) OF CONTRACTS § 163 (stating that "[i]f a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows or has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent), there is no contract in this hypothetical because the would-be seller's misrepresentation went to an essential term. Thus, the investor's apparent assent is not effective. Even though there is no contract, a court might well find a "purchase" under the meaning of the '34 Act; what allows the apparent seller to escape contractual obligation is a misrepresentation—the very evil at which the Act is aimed.

We do not, of course, take issue with any of the salutary principles of contract law relied on by the dissent. Dissent at 1433–1434. On the undisputed facts of the case, however, they are inapplicable. When on March 8, Mrs. Dunphy on Northland's behalf wired the funds to Union First, she was not performing Northland's side of the bargain, but was rather attempting to put the money in escrow until Allied closed the deal on Northland's behalf. At the aborted closing on the very next day Allied, as Northland's agent, became aware that Mr. Claxton was proposing different terms from those of the investing SBIC's. When Mr. Barnum and Mrs. Dun-

## C

Northland argues that *Baurer v. Planning Group, Inc.*, 669 F.2d 770 (D.C.Cir. 1981), compels the conclusion that a purchase or sale took place here. In *Baurer*, an investor advanced $15,000 in exchange for a promissory note from a company. The note provided that if at the end of a thirty-day period the investor and the company were not able to come to terms on a partnership venture, the $15,000 would become due and payable together with certain accrued interest. If, on the other hand, an agreement were reached, the note would be deemed paid in full and only accrued interest would be due. The court concluded that the promissory note was a security, because the terms of the agreement, described in the note, "established its investment character." *Baurer*, 669 F.2d at 778.

*Baurer*'s holding, however, is inapposite to the case before us. The issue here is not whether a warrant is a "security," but whether Northland was a "purchaser" of the warrant. In *Baurer*, no one argued that the investor did not purchase the note, for there was explicit mutual assent between the parties in the exchange of funds for the note. In this case, however, there was no mutual assent. Indeed, as we have seen, the financial transaction in which the warrant was to be purchased was never closed, and no separate bargain between Northland and Watkins was ever struck.

Appellant also argues that we should analogize Mr. Claxton's sending of the documents to Northland to a pledge. Because *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), holds that a pledge is a "sale" of a security under the '33 Act, Northland contends that a pledge is also a sale of securities under the '34 Act. Passing over the substantial question whether the differences between the '33 Act and the '34 Act in the statutory definition of sale would compel a different conclusion about whether a pledge is a sale under the latter's definition,[15] we conclude that no pledge occurred, for the simple reason that Northland and Watkins never agreed to a pledge of securities. Indeed, Northland, like the other SBIC's in the deal that Mr. Silver structured, never even bargained for a pledge but contemplated the outright purchase of Watkins' securities.[16]

The dissent argues that the requirement of mutual assent in this case is not consistent with a variety of securities law deci-

---

phy returned from vacation, Mr. Barnum found an agreement, that Mr. Claxton had sent, with differing terms. Mr. Barnum never signed that varying agreement. Therefore, at no time could Northland, as the dissenting opinion asserts, have reasonably been under the impression that Watkins had accepted performance on the terms of the investing SBIC's.

**15.** The '33 Act defines a sale as including "every contract of sale or disposition of a security or *interest in a security* ...." 15 U.S.C. § 77b(3). The '34 Act defines a sale as including simply "every contract to sell or otherwise dispose of [a security]." 15 U.S.C. § 78c(a)(14). The circuits are split on whether a pledge comes within the ambit of the definition in section 78c(a)(14) and therefore on whether it is a sufficient predicate for jurisdiction under 10b–5. *Compare, e.g., Alley v. Miramon*, 614 F.2d 1372 (5th Cir.1980) (finding that a pledge is not a sale) with *Mallis v. FDIC*, 568 F.2d 824 (2d Cir.1977), *cert. granted*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, *cert dismissed as improvidently granted sub nom. Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (finding that a pledge is a sale).

**16.** Appellant also argues that *Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234 (D.C.Cir.1978), supports its position that it is a purchaser. In *Sacks*, a former account representative of Reynolds sued under 10b–5 claiming that Reynolds had failed to transfer her personal accounts and accounts of some of her customers to her new brokerage firm. She claims that because the *agreement between Reynolds and her to transfer the securities was a contract to "otherwise dispose of [securities]," see* 15 U.S.C. § 78c(a)(14), the transaction constituted a "sale" of securities within the meaning of the Act. The *Sacks* court held that the transaction was not a "sale," because the purchase or sale requirement of 10b–5 required "some surrendering of control, change in ownership, or change in fundamental nature of an investment." Northland seizes on this language to suggest that its "surrendering" of funds and Mr. Claxton's "surrendering" of a security gives it standing to sue under 10b–5. Once again, however, *Sacks* is inapposite because it did not address the unique problem presented here, namely the lack of mutual assent. In *Sacks* there was no dispute that the account representative and Reynolds agreed to the transfer.

sions. Dissent at 1435. We have already shown that it is consistent with controlling law of this circuit. The principal genre of cases from other circuits with which the dissent deems our approach inconsistent are the "forced seller" cases in which a dissenting shareholder is forced to exchange securities for cash or other securities in a liquidation or merger. That situation is exceedingly remote from the facts of this case. As the very name "forced sale" suggests, an exchange in a merger or liquidation that is a result of the operation of governing corporate law, and the contractual structure of corporate governance itself, is not different in kind from a contractual exchange. The scope and legal significance of both types of exchanges are defined by well established principles of law, unlike the aborted transaction here. Our holding today as to the facts presented to us by no means goes to the far different settings embodied in the "forced seller" cases.[17]

### D

Finally, we emphasize that our decision does not in any manner undermine the broad remedial policies of Rule 10b–5 and the '34 Act. The '34 Act is designed to protect investors and safeguard the operation of the Nation's capital markets. However, as the Supreme Court has stated, "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). Specifically,

the federal securities laws do not confer upon the federal courts a roving commission to address every injury that a sophisticated, albeit small, investment concern such as Northland may suffer in the course of *attempting* to negotiate and close a deal. The proximate cause of Northland's misfortune was plainly the failure to place the $50,000 in escrow until the closing. The proper business arrangements were not effected with Union First Bank, and the transfer transformed Watkins in effect into Northland's escrow agent. When no closing occurred, Watkins failed to return the funds Northland thought it had entrusted to Union First. Such facts might well give rise to claims under applicable District of Columbia or state law, but they simply do not constitute the purchase or sale of securities under the '34 Act.[18]

*Affirmed.*

WALD, Circuit Judge, dissenting:

I must dissent from the panel's decision that Rule 10b–5 does not protect a person who is fraudulently induced to exchange $50,000 in return for a worthless security. The majority, I think mistakenly, finds no "purchase or sale" for Security Exchange Act purposes, because the preconditions laid down by Northland to issuing the warrant had not been met, and hence there was no "meeting of the minds" between Watkins and Northland. By imposing its own "meeting of the minds" prerequisite to a "purchase or sale" under the Act the majority shields from the investor protection provisions of the Securities Exchange Act

**17.** We do not, needless to say, suggest the presence of a requirement of *mutual* assent regardless of the circumstances presented. Rather, since we do not have before us a transaction reflecting an extraordinary change in the structure of the corporation, as would be the case with a merger or liquidation, we must examine a transaction between two *unrelated* parties to determine the nature of that transaction and the legal incidents flowing therefrom. The element of mutual assent thus guides us, in these circumstances, in our analysis, but we obviously need not and therefore do not erect it as a requirement in settings completely alien to the facts before us.

**18.** Appellant does not argue that the district court erred in dismissing the common law fraud claim after dismissing the federal claim to which it was pendent. The dismissal was clearly within the court's discretion. *See Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768 (D.C.Cir.1982) (reversing the district court's decision to retain pendent jurisdiction over common law claims when federal claims were dismissed before trial). *See also United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (stating that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

the very kind of fraudulent conduct which was a core concern of the drafters. Furthermore, the panel's restrictive reading of "purchase or sale" in this case on the one hand is directly at odds with the broad reading of "purchase or sale" that other courts have adopted to effectuate the Act's remedial purposes and on the other hand serves none of the policies which the Supreme Court has in different factual contexts invoked to justify a purchaser or seller requirement for standing in private damage actions.

The facts of this case have been amply, and in the main accurately, detailed in the majority opinion. Because this is an appeal from the district court's granting of the defendants' motion for summary judgment, we must view the facts and the reasonable inferences that may be drawn from them in the light most favorable to the appellant. See National Souvenir Center, Inc. v. Historic Figures, Inc., 728 F.2d 503, 512 (D.C.Cir.1984). So viewed, I believe the majority has given too short shrift to several crucial facts which militate against dismissal of the defrauded company's claim before any trial has been held. Based on the uncontested facts before the trial court, this is what happened on the critical days in early March.

On March 8, after failing to get requested instructions from Allied, the lead SBIC on whom Northland relied to set the final terms of its intended investment, Northland called Claxton directly and asked how it should transmit the money it intended to invest in Watkins in time for the closing scheduled for March 9. Claxton instructed Northland to wire the funds directly to Watkins' bank account. We can therefore presume Claxton was aware on March 9 that Northland's $50,000 had already been deposited in Watkins' account.

On March 9, Claxton met with David Gladstone, executive vice-president of Al-

lied, to close the deal, but they were unable to do so. There is no question Claxton knew at this time that Allied's proposal for the joint investment was different from Watkins' proposal of the contemplated transaction. This was one reason no deal came off. Nonetheless, despite the failure to close the deal on March 9, and with full knowledge that Northland desired to participate in a loan along with other SBICs only on Allied's terms, Claxton did not return Northland's $50,000. Rather, acting as a duly authorized officer of Watkins, he sent Northland, alone among the SBIC's, a stock warrant and debenture note for $50,-000, the precise amount deposited in Watkins' account, subject to the terms of the agreement ultimately worked out.[1] From these facts, it must be inferred in appellant's favor that the warrant and note were sent by Claxton in return for Northland's $50,000.

There is little question that Claxton's undisputed conduct—use of forged financial statements to induce investment in his company—is a target of Rule 10b–5. See Baurer v. Planning Group, Inc., 669 F.2d 770, 773 n. 14 (D.C.Cir.1981) ("Rule 10b–5 reaches 'any person' engaged in fraud to induce the purchase of securities") (quoting A. Bromberg & L. Lowenfels, Securities Law § 2.1 (1981)). There is also little question that Northland was injured by such misrepresentation because it lost $50,000, which Watkins appropriated to its own use. The majority nonetheless concludes that because Allied's fortuitous discovery of the forgery prevented the deal from closing, Northland cannot maintain a Rule 10b–5 action.

The majority purports to rest this conclusion on the strict tenets of contract law which it says require a "meeting of the minds" between Watkins and Northland before Northland can be a "purchaser" of

---

1. At argument, counsel for Northland stated that, although the district court record is unclear, in fact no other SBIC received stock warrants. Appellees did not take issue with this assertion. Even if the Appellees had taken issue and the record was therefore less than totally

clear, as the majority states, we still must assume on review of this grant of summary judgment that Claxton sent a stock warrant and debenture note only to Northland. See Maj.Op. at n. 2.

securities so as to come within the protective orbit of the antifraud provisions of the Securities Exchange Act. Maj.Op., at 1427 n. 9. In so doing, it shortchanges the investor here in three respects.

First, it ignores the well accepted principle of contract law that a person who knows the terms of an agreement proposed by another party, and who subsequently accepts performance by that party, cannot avoid his contractual obligations by claiming there was "no meeting of the minds." [2] See Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 184 F.Supp. 116 (S.D.N.Y.1959), aff'd, 274 F.2d 805 (2d Cir.), cert. denied, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960); see, e.g., Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3d Cir.1965); In re Mailers Unlimited, Inc., 6 B.R. 238, 240 (Bkrtcy.E.D.Pa.1980). "The manifestations of the parties are operative [to contractually bind them] in accordance with the meaning attached to them by one of the parties if that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party." Restatement (Second) of Contracts § 20(2) (1979). And "the conduct of a party [such as acceptance of performance] may mainfest assent even though he does not in fact assent." Restatement (Second) of Contracts § 19(3)

(1979). Here, Claxton knew of the terms Northland desired when it sent its $50,000, but Northland did not know that Watkins had proposed its own terms. Thus, Northland could reasonably regard Watkins' acceptance of its $50,000 as manifesting assent to those terms, and Watkins, having accepted the money, cannot later claim no contract was formed because there was no meeting of the minds.

Second, the majority ignores the definition of "sale" in the Securities Act of 1933, passed only one year before the Securities Exchange Act and authoritatively used as a source for definition of statutory terms common to both Acts. The Securities Exchange Act of 1934 did not explicitly define "purchase or sale," but there is "no reason to believe that Congress intended, one year after the passage of the Securities Act, to dilute the concept of sale in the Securities Exchange Act." Lawrence v. Securities Exchange Comm., 398 F.2d 276, 280 (1st Cir.1968).[3] In the 1933 Act Congress explicitly provided that "sale" includes any "disposition of ... an interest in a security for value," 15 U.S.C. § 77b(3), and thereby obviously envisioned coverage of transactions like that between Northland and Watkins here.

Third, the majority fails to identify a single policy reason why a court should

**2.** Even where a person accepts performance without knowing the terms on which performance is tendered, the person is obligated to pay for the value received. See Corbin on Contracts, § 102 (1963). This legal obligation is a recognition of the reality that some kind of exchange or "sale" has taken place.

**3.** See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1029 (6th Cir.1979); National Bank of Commerce v. All American Assurance Co., 583 F.2d 1295, 1298 (5th Cir.1978) ("although there are slight differences in wording between the 1933 Securities Act and the 1934 Securities Exchange Act, the definitions of [purchase and sale] are functionally equivalent"); Daniel v. International Brotherhood of Teamsters, 561 F.2d 1223, 1242 (7th Cir.1977) (in both [the 1933 and 1934] Acts a 'sale' of an interest [in a security] ... depends upon whether there has been a disposition of it"), rev'd on other grounds, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); Mallis v. Federal Deposit Insurance Corp., 568 F.2d 824, 828–30 (2d Cir.1977) (relying on 1933

Act definition of sale to hold a pledger of a security is a seller, and therefore has standing to sue under Rule 10b–5), cert. dismissed, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978); L. Loss, Fundamentals of Securities Regulation, 655–56, 922–23 (1983) ("there is authority for looking to the 1933 Act definition [of sale] in construing the 1934 Act on an in pari materia approach"); cf. Rubin v. United States, 449 U.S. 424, 432, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1981) (Blackmun, J., concurring) (referring to definition of sale in 1934 Act in interpreting 1933 Act to cover pledges of securities); International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 556 n. 8, 99 S.Ct. 790, 795 n. 8, 58 L.Ed.2d 808 (1979) (implying that a sale under the 1934 Act includes any disposition for value, but noting the Court "need not decide whether the meaning of 'sale' under the Securities Exchange Act is any different from its meaning under the Securities Act").

**1434**

ignore both contract law principles and federal securities law history, and read Rule 10b–5's "purchase or sale" prerequisite more restrictively than the common law. All of this it does in the name of the test for standing to bring a private damage suit adopted by *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Maj.Op. at 1426–1427. I disagree, however, that *Blue Chip* in any way supports the majority's conclusion that no purchase or sale occurred in this case.

In *Blue Chip*, the Supreme Court, following the rule first laid down in *Birnbaum v. Newport Steel Co.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), announced that only "purchasers or sellers" of securities have standing to bring private damage actions under Rule 10b–5. In doing so, *Blue Chip* never talked about "meeting of the minds" as part of its "purchaser or seller" requirement. Rather, it explained that the *Birnbaum* rule denied standing to three classes of potential plaintiffs: (1) offerees who allege merely that they *would have* purchased a security but for the fraud, (2) shareholders who allege merely that they *would have* sold their shares but for the fraud, and (3) shareholders who allege that the fraud decreased the value of their investment, but who do not allege that the fraud influenced their investment decisions. *See Blue Chip*, 421 U.S. at 738–39, 95 S.Ct. at 1926–27. The stated purpose of Blue Chip's adoption of the *Birnbaum* standing doctrine was the prevention of "strike suits" and the elimination of private damage actions that would require a treacherous inquiry into the plaintiffs' subjective decisions regarding whether to invest or sell. *See* 421 U.S. at 740, 746, 95 S.Ct. at 1927, 1930.

In this case, by contrast, Northland obviously does not fall within any of the three classes of plaintiffs that *Blue Chip* sought to eliminate. In fact, the policies reflected in *Blue Chip* do not apply at all, since

Northland paid its money and received securities in return. No court would have to embark on a subjective inquiry in order to decide whether a "purchase or sale" occurred in this case; under the facts alleged, it seems quite clear that an objective exchange of money and securities between Northland and Claxton took place. Quite candidly, the majority's concerns regarding the *Blue Chip* standing doctrine entirely elude me.

In fact, a closer examination of the *Blue Chip* case reveals that the exchange of money for securities that occurred in this case should be considered a "purchase or sale" for the purposes of Rule 10b–5. As the Court noted in *Blue Chip*, the bounds of standing to sue cannot be "derive[d] from the language of [section] 10(b)." 421 U.S. at 737, 95 S.Ct. at 1926. Accordingly, the Court turned to "policy considerations ... to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance." *Id.* While recognizing the overriding remedial policy behind the implied cause of action under section 10(b)—to allow "deserving plaintiffs [to] recover ... damages which in fact have been caused by violations of Rule 10b–5," 421 U.S. at 738, 95 S.Ct. at 1926—the court nonetheless adopted the *Birnbaum* rule because that rule has "countervailing advantages ... purely as a matter of policy," namely limiting the potential for widespread vexatious litigation. 421 U.S. at 739–40, 95 S.Ct. at 1927–28. I can imagine no legitimate need for such a "limiting principle" to bar this suit, however, where money and securities changed hands, and the plaintiff apparently lost a sizeable sum.

Contrary to the majority's statement, *Blue Chip's* holding was thus not "based ultimately on its interpret[ing] ... the language of the Act and its legislative history," so much as on its balancing of the injuries that would flow from including or excluding nonsellers and nonpurchasers from the Rule's protection.[4] *Blue Chip's*

4. In fact, the *Blue Chip* majority's heavy reliance on policy prompted three justices who con-

curred in the majority opinion to issue a separate opinion "emphasiz[ing] the significance of

policy analysis thus can be instructively applied here. The majority's "meeting of the minds" prerequisite, like the *Birnbaum* rule, has the "disadvantage" of "prevent[ing] some deserving plaintiffs from recovering damages that in fact have been caused by violations of Rule 10b–5." 421 U.S. at 738, 95 S.Ct. at 1926. On the other hand, it not only has none of the "countervailing advantages" of the *Birnbaum* rule in preventing "strike suits" and litigation turning on subjective proof of what a plaintiff would have done in a hypothetical situation, but in fact, the "meeting of the minds" requirement is in tension with the purposes of the *Birnbaum* rule because it invites a defendant to rebut objective evidence of a sale with subjective contentions that the parties never actually agreed to the terms of the transaction. *See Blue Chip*, 421 U.S. at 747, 95 S.Ct. at 1931. The majority's tunnel-visioned focus on *Blue Chip*'s discussion of the Act's language and history is thus understandable since, unlike the Court in that case, it can point to no policy of the Act which is advanced in this case by restricting standing of an actual investor, who pays money intending to purchase one kind of security, but receives a different and ultimately worthless kind from the seller.

As this and other courts have recognized, the remedial policies of the anti-fraud provision of the Security Exchange Act embodied in Rule 10b–5 command a liberal interpretation of "purchase or sale"; accordingly, the courts have read the rule to allow private damage suits in situations much less recognizable as traditional sales or purchases than this one. *See Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234,

1240 (D.C.Cir.1978); *Broad v. Rockwell International Corp.*, 614 F.2d 418, 435 (5th Cir.1980), *aff'd in part and rev'd in part on other grounds*, 642 F.2d 929 (5th Cir.) (*en banc*), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *Goodman v. Epstein*, 582 F.2d 388, 410 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Mader v. Armel*, 402 F.2d 158, 160 (6th Cir.1968), *cert. denied*, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969); *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 634 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). Thus, courts have granted standing to plaintiffs: (i) whose securities were converted to claims for cash by merger or liquidation,[5] (ii) where stock was pledged as collateral for a loan,[6] (iii) and where a shareholder agreement granted a corporation a right of first refusal to purchase stock.[7] These decisions demonstrate that, for purposes of standing to sue under Rule 10b–5, all that is required is a non-gratuitous "surrendering of control, change in ownership, or change in the fundamental nature of an investment...." *Sacks*, 593 F.2d at 1240; *see also Baurer*, 669 F.2d at 779 (a purchase of a security occurred since "notes were ... disposed of ... and value was given [in return]"); *see also* 15 U.S.C. § 77b(3) (1933 Act definition of "sale" includes any disposition of a security for value).

Although the majority says it takes no issue with the holdings of these cases, Maj.Op. text at n. 17, its self imposed requirement in this case that there be a "meeting of the minds" in fact poses an irreconcilable conflict with them. Under

---

the text of the Acts of 1933 and 1934 and especially the language of § 10(b) and rule 10b–5." *Blue Chip*, 421 U.S. at 755, 95 S.Ct. at 1935 (Powell, J., joined by Stewart and Marshall, JJ., concurring).

**5.** *See Alley v. Miramon*, 614 F.2d 1372, 1380–81, 1384–85 (5th Cir.1980) (liquidation deemed forced sale); *Bolton v. Gramlich*, 540 F.Supp. 822, 839–40 (S.D.N.Y.1982) (same); *Valente v. Pepsico*, 454 F.Supp. 1228, 1236–37 (D.Del.1978) (merger deemed forced sale); *see also* L. Loss, *supra* note 3, at 923–24 (1983).

**6.** *See Chemical Bank v. Arthur Andersen & Co.*, 552 F.Supp. 439, 450–51 (S.D.N.Y.1982), *rev'd on other grounds*, 726 F.2d 930 (2d Cir.1984); *see also* L. Loss, *supra* note 3, at 925.

**7.** *See McCloskey v. McCloskey*, 450 F.Supp. 991 (E.D.Pa.1978), (noting "if Congress had intended to limit [section 10b] to exclude [an] executory contract ... it could simply have defined the term as any *non-executory contract*." (emphasis in original)).

the majority's test, for instance, a merger or liquidation's transformation of a stockholder's shares into claims for cash would involve no "meeting of the minds" since the stockholder never agrees to dispose of the stock for a bargained price. The majority's cite to one isolated Rule 10b–5 case that did invoke the "meeting of the minds" doctrine, *see* Maj.Op. at 1427 (citing *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir.1972)), also fails to persuade. *Radiation Dynamics* was an insider trading case in which the issue was whether the defendant had already agreed to purchase the shares before he acquired the inside information. If the fraud postdated the agreement to purchase, no cognizable injury occurred. The court used a "meeting of the minds" test to determine at what point the agreement was reached. That use of the "meeting of the minds" test in no way predetermines its requirement as an element of a "purchase or sale" under the Securities Exchange Act. Where, as here, the commitment is completed by the very act of paying for the security, injury is attributable to the fraud whether or not an actual agreement was reached. Thus, *Radiation Dynamics* does not stand for the proposition that no sale or purchase can exist without a "meeting of the minds." In

this case, the policies of the Act require recognition that a "sale" occurred when the deal failed to close and Claxton nevertheless sent Northland a stock purchase warrant and a debenture note rather than returning Northland's $50,000.[8]

In sum, I find that the majority's insistence on a meeting of the minds, in the strict contract law sense, as a prerequisite to finding a purchase or sale for purposes of allowing a private damages action under the Securities Exchange Act contravenes the remedial policy of Rule 10b–5, conflicts with prevailing precedent, which broadly construes the purchase or sale requirement for Rule 10b–5 actions, and is totally unjustified by the Supreme Court's *Blue Chip* opinion.[9] For these reasons, I dissent.

---

**8.** Of course, before Northland can recover from any principal of Watkins, it must show he acted with the requisite scienter. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Thus, my position in this case would not automatically impose liability on any defendant if, as the facts were developed at trial, he can show that he was not aware of the fraudulent scheme to induce investment.

**9.** In responding to this dissent, the majority makes several discrete arguments to which I reply in this note:

(a) It argues that *Blue Chip* pointed out the difference between the phrase "offer and sale" in the 1933 Act and "sale" in the 1934 Act and thereby inferred a broader coverage of transactions under the 1933 Act. *See* Maj.Op. 1426 n. 5. There is no debate on that point. I argue something quite different—that "sale" means the same thing in both Acts. *See supra* 1433 n. 3. The authorities are unanimous on this point, and there is not even a whisper in *Blue Chip* to the contrary.

(b) Nor is there any dispute, as the majority suggests, *see* Maj.Op. 1426 n. 7, over *Blue Chip's* holding that one who did not buy or sell or security has no standing to bring a Rule 10b–5 damages action. Again, that has nothing to do with whether the facts here fall within the definition of "sale."

(c) In its footnote 11, the majority misperceives my view of the facts. I do not contend that by sending $50,000 to Watkins, Northland was making an independent offer. I maintain rather that because Northland tendered performance (*i.e.,* payment) under terms proposed by the other SBIC's as part of the joint venture, and because Claxton knew that Northland made the payment intending to be a joint venturer under these terms and that the joint venture did not close, he was obligated to return Northland's money or else be held legally responsible for having "sold" the warrants he mailed out in return for the money.